DOCUMENT FOR PUBLIC RELEASE. The decision issued on the date below is subject to an ASBCA Protective Order. This version has been approved for public release.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| ECC International Constructors/ Metag | ) ASBCA No. 62124 |
| (JV) | ) |
| | ) |
| Under Contract No. W5J9LE-11-C-0046 | ) |

APPEARANCES FOR THE APPELLANT: R. Dale Holmes, Esq.
 Ryan Boonstra, Esq.
  Cohen Seglias Pallas Greenhall & Furman,
  P.C.
  Philadelphia, PA

APPEARANCES FOR THE GOVERNMENT: Michael P. Goodman, Esq.
  Engineer Chief Trial Attorney
 Martin Chu, Esq.
  Engineer Trial Attorney
  U.S. Army Engineer District, Baltimore

 Samuel J. Harrison, Esq.
 Katherine M. Smith, Esq.
  Engineer Trial Attorneys
  U.S. Army Engineer District, Middle East
  Winchester, VA

OPINION BY ADMINISTRATIVE JUDGE SWEET

This appeal involves a contract between the United States Army Corps of Engineers (Corps) and appellant ECC International Constructors/Metag (JV) (Joint Venture) to construct arch-span structures at Camp Hero East in Kandahar Province, Afghanistan. The contract required that the Joint Venture include a spray polyurethane foam insulation (foam) and cementitious finish, and that that foam assembly comply with the International Building Code, which required that the foam limit flame-spread and smoke-development and have a thermal barrier. The foam assembly that the Joint Venture initially installed did not meet those requirements. Therefore, the Corps suspended work, and required the Joint Venture to add a thicker thermal barrier. In this appeal, the Joint Venture argues that that conduct constituted a constructive change, which delayed the project. Because the Corps did not direct the Joint Venture to perform work not required under the terms of the contract, or enlarge the Joint Venture's performance requirements, there was no constructive change. Thus, we deny the appeal.

DOCUMENT FOR PUBLIC RELEASE. The decision issued on the date below is subject to an ASBCA Protective Order. This version has been approved for public release.

FINDINGS OF FACT

I. Contract

1. The North Atlantic Treaty Organization Training Mission-Afghanistan and the Combined Security Training Command-Afghanistan trained the Afghan National Security Forces. The Corps performed contracting functions for the Combined Security Training Command-Afghanistan for the design and construction of facilities for the Afghan National Security Forces. The Corps performed those functions through the Transatlantic Division and its two subordinate commands—the Transatlantic District-North and the Transatlantic District-South, which covered northern Afghanistan and southern Afghanistan respectively.[1] (Gov't resp. to Board's June 2, 2023 Order, ex. 1 (Adams aff.) ¶¶ 4-5;McFerrin aff. ¶¶ 12-14)

2. On August 24, 2011, the Transatlantic District-South awarded Contract No. W5J9LE-11-CC-0046 (Contract) to the Joint Venture to construct facilities at Camp Hero East in Kandahar Province, Afghanistan (Camp Hero East Project) (R4, tab 5 at 1; tab 16 at 1). The Project included the construction of numerous arch-span buildings[2] (R4, tab 5 at 70). Only the Transatlantic District-South Contracting Officer had the authority to revise the design or direct changes, and he did not delegate that authority (R4, tab 436 (Emanuel decl.) ¶ 2).

3. The Contract required that "[t]he work shall conform to the specifications and the contract drawings" (R4, tab 5 at 29; *see also id.* at 53, 68, 71, 218).

4. The specifications repeatedly required the Joint Venture to comply with the International Building Code (Code) (R4, tab 5 at 70, 91-94, 120-21, 226). The Code § 2603.3 indicated that:

> [F]oam plastic insulation . . . shall have a flame spread index of not more than 75 and a smoke-developed index of not more than 450 where tested in the maximum thickness intended for use in accordance with [American Society for Testing and Materials] E 84 or [Underwriters Laboratories] 723.

---

[1] Prior to a reorganization in 2009, the Transatlantic District-North and the Transatlantic District-South were called the Afghanistan Engineer District North and the Afghanistan Engineer District South respectively (gov't resp. to Board's June 2, 2023 Order, ex. 1 (Adams aff.) ¶ 4(c); McFerrin aff. ¶¶ 12-14).

[2] Arch-span buildings—sometimes called K-Span buildings—are buildings constructed using steel rolled by a machine on-site (McFerrin aff. ¶¶ 4-5).

(R4, tab 178 at 562) The parties refer to foam that meets and does not meet the Code § 2603.3's flame-spread and smoke-development limit requirements as rated and non-rated foam respectively (*see* app. supp. R4, tab 280 at 3; app. br. at 37; gov't br. at 12). The Code § 2603.4 (collectively with the Code § 2603.3, Code Foam Assembly Provisions)[3] provided that:

> [F]oam plastic shall be separated from the interior of a building by an approved thermal barrier of ½ inch (12.7 mm) gypsum wallboard or equivalent thermal barrier material that will limit the average temperature rise of the unexposed surface to not more than 250⁰ F (120⁰ C) after 15 minutes of fire exposure, complying with the standard time-temperature curve of [American Society for Testing and Materials] E 119 or [Underwriters Laboratories] 263. The thermal barrier shall be installed in such a manner that it will remain in place for 15 minutes based on [Factory Mutual Laboratories] 4880, [Underwriters Laboratories] 1040, [National Fire Protection Association Code] 286 or [Underwriters Laboratories] 1715.

(R4, tab 178 at 563) Thus, we find that, by requiring compliance with the Code, the Contract required the use of rated foam and an adequate thermal barrier.

5. The Code § 104.10 set forth a procedure for modifying Code provisions (Code Modification Procedure) as follows:

> Whenever there are practical difficulties involved in carrying out the provisions of this code, the building official shall have the authority to grant modifications for individual cases, upon application of the owner or owner's representative, provided the building official shall first find that special individual reason makes the strict letter of this code impractical and the modification is in compliance with the intent and purpose of this code and that such modification does not lessen health, accessibility, life and fire safety, or structural requirements.

(R4, tab 178 at 29 (emphasis omitted); *see also* app. supp. R4, tab 387 at 7) For Corps projects in Afghanistan, the building official was the Authority Having Jurisdiction (app. supp. R4, tab 387 at 2). There were three potential Authorities Having

---

[3] We refer to the foam and the thermal barrier together as the foam assembly.

Jurisdiction (Potential Authorities Having Jurisdiction).  First, the Combined Security Training Command-Afghanistan designated the Director, CJ-Engineering, Colonel William Graham, as its Authority Having Jurisdiction (app. supp. R4, tab 52 at 4; tab 319 at 1).  Second, the Corps treated its Chief of the Engineering and Construction Directorate of Civil Works, James Dalton, as its Authority Having Jurisdiction (app. supp. R4, tab 93 at 2, tab 148; tab 177 at 2).  Third, other evidence suggests that the Transatlantic District-South Contracting Officer became the Authority Having Jurisdiction once performance began (*see* app. supp. R4, tab 211 at 1; tab 397 (Schmid dep.) at 55:5-24).  We find that, when the Combined Security Training Command-Afghanistan delegated responsibility to oversee the construction of the Camp Hero East Project to the Corps, and the Corps delegated that authority to the Transatlantic District-South, the Transatlantic District-South Contracting Officer became the Authority Having Jurisdiction. *Hoffman Constr. Co. of Alaska*, ASBCA No. 43814, 93-3 BCA ¶ 26,221 at 130,491; *see also Envtl. Chem. Corp.*, ASBCA Nos. 59280, 60760, 22-1 BCA ¶ 38,166 at 185,363.[4]

6.  The specifications also required compliance with the Combined Security Training Command-Afghanistan's Design Standards (Austere Standards) (R4, tab 5 at 91-92).  As amended, the Austere Standards general requirements stated that:

> Codes . . . applicable to United States construction or [United States] forces in [the Central Command] do not apply to projects constructed for the [Afghan National Security Forces], see [United States Central Command General Administration] 172001ZDEC10.  Facilities do not have to be designed or constructed to . . . codes; however, codes will be specified for design and construction with only specific exemptions as delineated elsewhere in these standards.

(App. supp. R4, tab 52 at 4) (emphasis added)  Those specific exemptions—found in the Austere Standard specific standards divisions—included design criteria such as:

> 1.  [Arch]-Span walls will be left exposed with polyurethane insulation.

---

[4] As discussed in greater detail below, however, it does not matter which of the Potential Authorities Having Jurisdiction was the Authority Having Jurisdiction because none of the Potential Authorities Having Jurisdiction granted a modification under the Code Modification Procedure for the initially-installed foam assembly.

2. Interior walls will be prefabricated metal sandwich panels. Interior walls do not need to meet fire boundary code requirements.

****

4. Drop ceilings will only be used in administrative buildings, medical facilities, and officer billeting. All other rooms will be open to the structure. Ceilings do not need to meet fire boundary code requirements.

(*Id.* at 6; *see also* app. supp. R4, tab 14 at 21) The Austere Standards contained no specific exemptions regarding foam flame-spread and smoke-development limitations, or thermal barriers (app. supp. R4, tab 52 at 6). Thus, while the Austere Standards generally exempted projects for Afghan National Security Forces from compliance with codes (*id.* at 4), we find that the exception for when a contracting officer specified a code for construction (*id.*) applied to the Contract's requirement that the Joint Venture comply with the Code Foam Assembly Provisions because the Contract specified for construction compliance with the Code (R4, tab 5 at 70, 91-94, 120-21, 226), and the Austere Standards did not delineate specific exemptions for foam flame-spread and smoke-development limitations, or thermal barriers (app. supp. R4, tab 52 at 6).

7. Even if there were an inconsistency between the Austere Standards and the Code, the Contact assigned responsibility for resolving any such inconsistency to the Contracting Officer (CO) (R4, tab 5 at 91).

8. Numerous Contract drawings (Baker Drawings) showed arches covered in foam encased in a cementitious finish[5] (app. supp. R4, tab 13 at 12; tab 14 at 2-5, 9-10; tab 15 at 2-3). To be a Code-complaint thermal barrier, a cementitious finish must be tested (*see* app. supp. R4, tab 397 at 117-18; Garabedian aff. ¶ 6). However, the Joint Venture's Fire Protection Engineer, Andre Garabedian, admitted during performance that a cementitious finish could be an approved thermal barrier to apply over rated foam (R4, tab 285 at 3). Indeed, Mr. Garabedian acknowledged that, as a thermal barrier, a cementitious finish had the advantage over intumescent paint of not being damaged and exposing the foam if bumped or impacted (*id.*). Moreover, there was at least one cementitious fireproofing—Monokote Z—which met National Fire

---

[5] Cementitious finish is a fire-proofing material commonly used to protect structural steel from fire exposure. It is applied as a slurry by spray, and cures to a hard rough texture similar to stucco. (R4, tab 432 at 10)

Protection Association Code 286 and American Society for Testing and Materials E 84 at sufficient thickness (R4, tab 434 (Garabedian dep.) at 47:1-48:8).

9.  The Contract also indicated that:

> All submittals not requiring Designer of Record or Government approval will be for information only . . . . Approval of the Contracting Officer is not required on [for information only] submittals.  These submittals will be used for information purposes.  The Government reserves the right to require the Contractor to resubmit any item found not to comply with the contract.  This does not relieve the Contractor from the obligation to furnish material conforming to the plans and specifications and will not prevent the Contracting Officer from requiring removal and replacement if nonconforming material is incorporated in the work.

(R4, tab 5 at 220)  The Contract required the Transatlantic District-South to approve construction transmittals for foam (*id.* at 219-20).  The Contract assigned sole responsibility to the Joint Venture to ensure that all transmittals were complete, correct, and in strict conformance with the contract drawings and specifications (*id.* at 221).  The Transatlantic District-South's review or approval did not relieve the Joint Venture of its responsibility for any errors or omissions, or from complying with the Contract's requirements (*id.* at 221, 244).

10.  The Contract also encouraged the Joint Venture to propose alternative designs and products commonly used in the region if the variations were equal in performance from a technical standpoint and laid out a procedure to obtain approval for such variation requests (Contract Variation Procedure) (R4, tab 5 at 90).  In order to request a variation, the Contract provided that:

> If design or construction submittals show variations from the contract parameters and/or requirements due to site conditions, the Contractor shall justify such variations in writing at the time of submission.  Additionally, the Contractor shall also annotate block "h" entitled "variation" of ENG FORM 4025.

(*Id.* at 236)  The ENG Form 4025 form—which was attached to the Contract— indicated that "[a] check shall be placed in the 'Variation' column when a transmittal

6

is not in accordance with the plans and specifications—also, a written statement to that effect shall be included in the space provided for 'Remarks'" (*id.* at 244).

11. The Contract required that the Contracting Officer approve any variation (R4, tab 5 at 90, 240). The Contracting Officer did not delegate his authority (R4, tab 436 (Emanuel decl.) ¶ 2). The ENG Form 4025 indicated that the Corps would assign one of the following action codes:

> A—Approved as submitted.
> B—Approved, except as noted on drawings.
> C—Approved, except as noted on drawings. Refer to attached sheet resubmission required.
> D—Will be returned by separate correspondence.
> E—Disapproved (See attached).
> F—Receipt acknowledged.
> FX—Receipt acknowledged, does not comply as noted with contract requirements.
> G—Other (Specify)

(R4, tab 5 at 244)

12. Under the Contract, the Joint Venture had to correct any Contract noncompliance, and the CO could issue a stop work order until the Joint Venture took corrective action. No part of the time lost due to such a stop work order could be the subject of a claim for an extension of time, or for excess costs or damages. (R4, tab 5 at 95, 236)

II. Performance

    A. The Contracting Officer Did Not Approve a Variation or Modification Under the Contract Variation Procedure or the Code Modification Procedure for the Initially-Installed Assembly

13. On April 10, 2012, the Joint Venture submitted an ENG Form 4025 (First Transmittal), informing the Corps that the Joint Venture would use DERKIM DEFOAM 431 (Derkim) as the foam and DC315 intumescent paint (Paint) as the thermal barrier. The First Transmittal did not mention BASF or Bayer foam. In the First Transmittal, the Joint Venture expressly indicated in block h that there was no variation, failed to state in the remarks section or anywhere else that the transmittal was not in accordance with the plans and specifications, checked the "for information only" box instead of the "government approval" box, and did not justify any variation. On the contrary, the First Transmittal certified that the Derkim foam was in strict

conformance with the Contract drawings and specifications, without specifically discussing whether the Derkim foam complied with the Code § 2603.3.  Thus, we find that the First Transmittal was not a request for a variation under the Contract Variation Procedure, or for a modification under the Code Modification Procedure, let alone a request to use BASF or Bayer foam with 18 mil of the Paint.[6]  (App. supp. R4, tab 282 at 1-4)

14.  On April 17, 2012, the Transatlantic District-South responded to the First Transmittal on the ENG Form 4025 (First Transmittal Response).  The First Transmittal Response did not approve any variation by assigning an A Code (approved as submitted), a B Code (approved except as noted on drawings), or a C Code (approved except as noted on drawings . . . resubmission required).  Instead, the First Transmittal Response assigned an X Code (app. supp. R4, tab 288)—which we read to mean FX Code (receipt acknowledged, does not comply as noted with contract requirements) (R4, tab 5 at 244)[7]—and stated that the Derkim foam "[d]oes not meet the flame spread requirement" (app. supp. R4, tab 288).  Nor is there any evidence that the CO, or any other Potential Authority Having Jurisdiction (who had authority to modify compliance with the Code), wrote or authorized the Fist Transmittal Response (*id.*).  Further, the First Transmittal Response did not make a finding that special individual reasons made complying with the strict letter of the Code Foam Assembly Provisions impractical; a modification complied with the intent and purpose of the Code; and a modification did not lessen health, accessibility, life and fire safety, or structural requirements.  Therefore, we find that the First Transmittal Response was not an approval of a variation under the Contract Variation Procedure, or of a modification under the Code Modification Procedure, let alone for the use of BASF or Bayer foam with 18 mil of the Paint.

15.  Indeed, the Joint Venture recognized that the First Transmittal Response did not approve the First Transmittal by asking in an April 18, 2012, re-submittal of the First Transmittal (Re-Submitted First Transmittal) that the Corps re-review the First Transmittal.  The Re-Submitted First Transmittal did not address BASF or Bayer foam.  In the Re-Submitted First Transmittal, the Joint Venture indicated in block h

---

[6] As discussed below, the Joint Venture initially installed—and the Transatlantic District-South rejected—BASF and Bayer foam with 18 mil of the Paint.

[7] Code X was a typo because the ENG Form 4025 did not list an X Code (R4, tab 5 at 244).  We find that the Transatlantic District-South meant to assign an FX Code because that was the only code with an X in it (*id.*).  Moreover, an FX Code stood for "[r]eceipt acknowledged, does not comply as noted with contract requirements" (*id.*), which was consistent with the First Transmittal Response's statement that the foam "[d]oes not meet the flame spread requirement" (app. supp. R4, tab 288).

that there was no variation, failed to state in the remarks section or anywhere else that the transmittal was not in accordance with the Contract's plans and specifications, checked the "for information only" box instead of the "government approval" box, certified that the foam assembly was in strict conformance with the contract drawings and specifications, included a Declaration of Conformity, and did not justify any variation.  Thus, we find that the Re-Submitted First Transmittal was not a request for a variation under the Contract Variation Procedure, or for a modification under the Code Modification Procedure, let alone for a variation or a modification to use BASF or Bayer foam with 18 mil of the Paint.  (R4, tab 132; app. supp. R4, tab 281)

16.  The Transatlantic District-South then conducted internal discussions about how to code the Re-Submitted First Transmittal.  In an April 21, 2012, email, a Transatlantic District-South Structural Engineer, Adam Justice, recommended a B Code (approved, except as noted on drawings) (app. supp. R4 tabs 284-85; R4, tab 5 at 244).  However, we find that that opinion represented the internal opinion of one engineer.  That engineer's opinion did not constitute approval of a variation request under the Contract Variation Procedure, or of a modification request under the Code Modification Procedure, because that opinion was not adopted by the Contracting Officer—or anyone with authority—or even communicated to the Joint Venture—let alone on an ENG Form 4025.  Indeed, the engineer's internal opinion was not even the only internal opinion within the Transatlantic District-South.  In an April 21, 2012 email, Lorenzo Lora recommended giving an E Code (disapproved).  (App. supp. R4, tabs 284-85; R4, tab 5 at 244)

17.  Ultimately, the Transatlantic District-South rejected both Mr. Justice and Mr. Lora's recommendations.  On April 25, 2012, the Transatlantic District-South responded to the Re-Submitted First Transmittal on the ENG Form 4025 (Re-Submitted First Transmittal Response).  The Re-Submitted First Transmittal Response did not approve the Re-Submitted First Transmittal by assigning an A Code (approved as submitted), a B Code (approved, except as noted on drawings), or a C Code (approved except as noted on drawings . . . resubmission required).  Instead, the Re-Submitted First Transmittal Response merely acknowledged receipt by assigning an F Code (receipt acknowledged), and included no remarks.  Nor is there any evidence that the Contracting Officer, or any other Potential Authority Having Jurisdiction, wrote or authorized the Re-Submitted First Transmittal Response.  Further, the Re-Submitted First Transmittal Response did not make a finding that special individual reasons made complying with the strict letter of the Code Foam Assembly Provisions impractical; that a modification complied with the intent and purpose of the Code; or that a modification did not lessen health, accessibility, life and fire safety, or structural requirements.  Thus, we find that the Re-Submitted First Transmittal Response was not an approval of a variation request under the Contract Variation Procedure, or of a

modification under the Code Modification Procedure, let alone for the use of BASF or Bayer foam with 18 mil of the Paint. (App. supp. R4, tab 131; R4, tab 5 at 244)

18. Beginning in October 2012 and March 2013, the Joint Venture applied BASF and Bayer foam[8]—instead of Derkim foam—covered with 18 mils[9] of the Paint to the arch-spans (Initially-Installed Assembly) (R4, tab 76 at 25-27; ASUMF ¶ 149). The Initially-Installed Assembly did not comply with the Code Foam Assembly Provisions because the BASF and Bayer foam (Non-Rated Foam) was not rated—i.e., it did not have a flame-spread index of not more than 75 and a smoke-development index of not more than 450 where tested in the maximum thickness intended for use in accordance with American Society for Testing and Materials E84 or Underwriters Labs 723 (R4, tab 285 at 3; tab 432 at 13-15).

19. Again recognizing that the Corps had not approved a variation or modification for the use of the Non-Rated Foam, the Joint Venture submitted a new ENG Form 4025 on December 25, 2012 (Second Transmittal), indicating that the Joint Venture would use the Non-Rated Foam, but not mentioning the Paint. In the Second Transmittal, the Joint Venture indicated in the Second Transmittal in block h that there was no variation, failed to state in the remarks section or anywhere else that the transmittal was not in accordance with the plans and specifications, checked the "for information only" box instead of the "government approval" box, certified that the Second Transmittal was in strict conformance with the contract drawings and specifications, and did not justify any variation. Thus, we find that the Second Transmittal was not a request for a variation under the Contract Variation Procedure, or for a modification under the Contract Modification Procedure. (App. supp. R4, tab 289 at 1, 4-15)

20. The Transatlantic District-South responded to the Second Transmittal on January 27, 2013 (Second Transmittal Response). The Second Transmittal Response did not approve the Second Transmittal by assigning an A Code (approved as submitted), a B Code (approved, except as noted on drawings), or a C Code (approved except as noted on drawings . . . resubmission required). Instead, the Second Transmittal Response again merely acknowledged receipt by assigning an F Code (receipt acknowledged). Nor is there any evidence that the Contracting Officer, or any other Potential Authority Having Jurisdiction, wrote the Second Transmittal Response. Further, the Second Transmittal Response did not make a finding that special individual reasons made complying with the strict letter of the Code Foam Assembly

---

[8] The components of the BASF foam were Elastospray H 1611/31 and Iso PMDI92140. The components of the Bayer foam were Baymer SHPU-40-27 and Desmodur 44V20L (R4, tab 76 at 20).

[9] A mil is one-thousandth of an inch (ASUMF ¶ 115 n.10).

Provisions impractical; that a modification complied with the intent and purpose of the Code; or that  a modification did not lessen health, accessibility, life and fire safety, or structural requirements.  Thus, we find that the Second Transmittal Response was not an approval of a variation under the Contract Variation Procedure, or of a modification under the Contract Modification Procedure.  (R4, tab 5 at 244; app. supp. R4, tab 289 at 1)

      B.  <u>Fires at Other Arch-Span Buildings and Suspension of the Foam Assembly Installation on the Camp Hero East Project</u>

21.  In 2012, there were two fires involving the Non-Rated Foam on other arch- span building projects (R4, tab 255-59).

22.  In late March 2013, the Joint Venture finished installing the Initially-  Installed Assembly on the Camp Hero East Project (R4, tab 76 at 25-27).

23.  On April 7, 2013, the Transatlantic District-South Contracting Officer sent a letter to the Joint Venture suspending work associated with the foam assembly installation (R4, tab 65 at 1).

      C.  <u>A Dispute Between the Transatlantic District-South and the Transatlantic District-North Did Not Result in A Modification of the Code Foam Assembly Provisions by any Potential Authority Having Jurisdiction to Permit the use of the Initially-Installed Assembly on the Camp Hero East Project Under the Code Modification Procedure</u>

24.  In May 2013, a dispute arose between the Transatlantic District-South and the Transatlantic District-North about the acceptability of the Non-Rated Foam and the Paint.

25.  On the one hand, while the Transatlantic District-South acknowledged in a May 17, 2013 email that the Code allowed the Authority Having Jurisdiction to accept non-rated foam under the Code Modification Procedure (app. supp. R4, tab 387 at 2), a May 13, 2013 Transatlantic Division email and a March 10, 2013 Transatlantic District-South email show that the Transatlantic District-South's position was that there had been no such modification of the Code Foam Assembly Provisions to permit the Initially-Installed Assembly on the Camp Hero East Project (app. supp. R4, tab 94 (sheet 1 at rows 26, 36, 41, 42); tab 95 at 3, 7; *see also* app. supp. R4, tab 153 at 2).  In the May 17, 2013 Transatlantic District-South email, none of the three Potential Authorities Having Jurisdiction granted a modification of the Code Foam Assembly Provisions for the individual case of using the Initially-Installed Assembly based upon a finding that special individual reasons made complying with the strict letter of the

Code Foam Assembly Provisions impractical; a modification complied with the intent and purpose of the Code; and a modification did not lessen health, accessibility, life and fire safety, or structural requirements (app. supp. R4, tab 387 at 2). Thus, we find that the May 17, 2013, Transatlantic District-South email does not demonstrate that a Potential Authority Having Jurisdiction modified the Code Foam Assembly Provisions under the Contract Modification Procedure to permit the Initially-Installed Assembly on the Camp Hero East Project.

26. On the other hand, a May 11, 2013 Transatlantic Division email, the May 13, 2013 Transatlantic District-South email, the May 16, 2013 Transatlantic District-South email, a May 16, 2013 Transatlantic District-North power-point, and a May 17, 2013 Transatlantic District-North email (Transatlantic District-North Documents) expressed the Transatlantic District-North's position that non-rated foam with the Paint was acceptable on other projects besides the Camp Hero East Project under the Code Modification Procedure. Nevertheless, in the Transatlantic District-North Documents, none of the three Potential Authorities Having Jurisdiction granted a modification of the Code Foam Assembly Provisions for the individual case of using the Initially-Installed Assembly on the Camp Hero East Project based upon a finding that special individual reasons made complying with the strict letter of the Code Foam Assembly Provisions impractical; a modification complied with the intent and purpose of the Code; and a modification did not lessen health, accessibility, life and fire safety, or structural requirements. Thus, we find that the Transatlantic District-North Documents do not demonstrate that a Potential Authority Having Jurisdiction modified the Code Foam Assembly Provisions under the Contract Modification Procedure to permit the Initially-Installed Assembly on the Camp Hero East Project. (App. supp. R4, tab 90; tab 93 (sheet 2 at rows 16, 17, 19, 26, 29); tab 108, tab 121 at 1; ASUMF ¶ 183) [10] On the contrary, the May 11, 2013, email stated that "we really need a final [Authority Having Jurisdiction] determination [no later than] 20-30 days" (app. supp. R4, tab 90 at 1).

27. Accordingly, on May 13, 2013, the Transatlantic Division referred the dispute between the Transatlantic District-North and the Transatlantic District-South "as to the acceptability of 'equivalent' systems to ensure [Code] compliance" to Mr. Dalton as the Authority Having Jurisdiction (app. supp. R4, tab 93 at 2).

28. On May 22, 2013, Mr. Dalton issued an "Authority Having Jurisdiction . . . Decision" in response to the May 13, 2013 request, stating that:

---

[10] "ASUMF" refers to the Joint Venture's Statement of Undisputed Material Fact. "GRASUMF" refers to the government's response to the ASUMF.

I . . . find insufficient evidence to support code compliance or equivalency without further testing.

Research indicates that Baymer, manufactured by Bayer and other installed foams have not been tested for compliance with [American Society for Testing and Materials ] E 84 as required by the Code section 2603. In order to establish code equivalency, whether Baymer and others complies with [American Society for Testing and Materials] E 84, I recommend that you continue with your plan to perform required testing as contracted with Michael Baker Jr. Inc.

(App. supp. R4, tab 148 at 1 (emphasis added); *see also* app. supp. R4, tab 153 at 2 (acknowledging Mr. Dalton's decision and indicating that the North Atlantic Treaty Organization Training Mission-Afghanistan Commander agreed that the Corps should comply with the Code))

### D. The Contracting Officer Lifted the Stay and Allowed a Variation and a Modification to use the Non-Rated Foam with 50 mil of the Paint

29. On July 1, 2013, the Joint Venture advised the Corps that Bayer foam with 40 mils of the Paint, and BASF foam with 50 mils of the Paint, both passed the National Fire Protection Association Code 286 test (R4, tab 385 at 1; *see also* app. supp. R4, tab 335 (noting test results)). As a result, International Fireproof Technology indicated that the warranty only would be extended if the Joint Venture applied 50 mil of the Paint to the Non-Rated Foam (R4, tab 402 at 4).

30. On July 5, 2013, the Contracting Officer sent a letter to the Joint Venture lifting the April 7, 2013 partial suspension of work, and directing the Joint Venture to submit a corrective action plan (R4, tab 87 at 1-2). On July 28, 2013, the Contracting Officer issued a follow-up letter, indicating that the Non-Rated Foam did not meet the Code, and therefore the Contract's requirements. However, the Contracting Officer indicated that the Corps would accept the Non-Rated Foam if covered by 50 mils of the Paint or W.R. Grade Firebond bonding coat plus two 3/8-inch coats of Monokote Z-3306 (cementitious) or Monokote Z-3306/G (gypsum-based) thermal barriers because testing showed that such foam assemblies met thermal barrier requirements. (R4, tab 92)

31. Between October 11, 2013 and February 15, 2014, the Joint Venture applied the additional Paint (ASUMF ¶ 261; GRASUMF ¶ 261).

13

E. Mr. Dalton and the Transatlantic Division Approved the use of the Non-Rated Foam with 50 mil of the Paint

32. On August 28, 2013, Mr. Dalton issued a memorandum accepting the Non-Rated Foam with 50 mil of the Paint based upon the testing (app. supp. R4, tab 312).

33. In memoranda dated September 13, 2013 and January 21, 2014, and a June 20, 2014 letter (Transatlantic Division Modification Documents), the Transatlantic Division discussed how the Corps had authorized the use of the Non-Rated Foam with 50 mil of the Paint because that assembly had passed National Fire Protection Association Code 286 tests, without addressing the Initially-Installed Assembly.[11] In the Transatlantic Division Modification Documents, a Potential Authority Having Jurisdiction did not grant a modification of the Code Foam Assembly Provisions for the individual case of using the Initially-Installed Assembly on the Camp Hero East Project based upon a finding that special individual reasons made complying with the strict letter of the Code Foam Assembly Provisions impractical; a modification complied with the intent and purpose of the Code; and a modification did not lessen health, accessibility, life and fire safety, or structural requirements. Thus, we find that the Transatlantic Division Modification Documents do not demonstrate that a Potential Authority Having Jurisdiction modified the Code Foam Assembly Provisions under the Contract Modification Procedure to permit the Initially-Installed Assembly on the Camp Hero East Project. (R4, tab 203 at 1-2; tab 415 at 1-2; app. supp. R4, tab 368 at 6, 11)

---

[11] The September 13, 2013 memorandum expressly mentions the approval of the Non-Rated Foam with 50 mil of the Paint (R4, tab 203 at 1-2). The January 21, 2014 memorandum and the June 20, 2014 letter also clearly are discussing the approval of the Non-Rated Foam with 50 mil of the Paint—and not any approval of the Initially-Installed Assembly of Non-Rated Foam with 18 mil of the Paint—because: (1) the Transatlantic Division issued that memorandum and letter after the Contracting Officer rejected the Initially-Installed Assembly of the Non-Rated Foam with 18 mils of the Paint and the Transatlantic District-South subsequently modified the Code Foam Assembly Provisions to permit the Non-Rated Foam with 50 mils of the Paint; and (2) the January 21, 2014 memorandum and the July 20, 2014 letter expressly referred to the accepted assembly passing the National Fire Protection Association Code 286 test (app. supp. R4, tab 368 at 6, 12), and the assembly with 50 mil of the Paint—but not the Initially-Installed Assembly with 18 mil of the Paint—passed that test (finding 29).

F. The Transatlantic Afghanistan District Requested Permission to Base the Paint Thickness on Opaqueness

34. As the United States' involvement in Afghanistan decreased, the Corps closed the Transatlantic District-North and the Transatlantic District-South and assigned their responsibilities to the new Transatlantic Afghanistan District on July 9, 2013 (gov't resp. to Board's June 2, 2023 Order, ex. 1 (Adams aff.) ¶ 4(e)).

35. In September 28, 2013 and October 15, 2013 memoranda (Transatlantic Afghanistan District Memoranda), the Transatlantic Afghanistan District documented its decision to use the opaqueness of the Paint on other projects besides the Camp Hero East Project to determine the adequacy of the Paint thickness due to the operational needs of those other projects, and requested approval for that approach from CJ-Engineer Graham (app. supp. R4, tab 360 at 2; tab 363 at 1-3). In the Transatlantic Afghanistan District Memoranda, none of the three Potential Authorities Having Jurisdiction granted a modification of the Code Foam Assembly Provisions for the individual case of using the Initially-Installed Assembly on the Camp Hero East Project based upon a finding that special individual reasons made complying with the strict letter of the Code Foam Assembly Provisions impractical; a modification complied with the intent and purpose of the Code; and a modification did not lessen health, accessibility, life and fire safety, or structural requirements (app. supp. R4, tab 360 at 2; tab 363 at 1-3). Thus, we find that the Transatlantic Afghanistan District Memoranda do not demonstrate that a Potential Authority Having Jurisdiction modified the Code Foam Assembly Provisions under the Contract Modification Procedure to permit the Initially-Installed Assembly on the Camp Hero East Project.

36. Contrary to any suggestion by the Joint Venture, there is no evidence that CJ-Engineer Graham responded to—let alone approved—the Transatlantic Afghanistan District Memoranda (app. supp. R4, tab 360 at 2; tab 363 at 1-3). Indeed, the Joint Venture has failed to point to any documents in which CJ-Engineer Graham granted a modification to the Code Foam Assembly Provision under the Code Modification Procedures—let alone for the individual case of using the Initially- Installed Assembly on the Camp Hero East Project.

37. As a result of the above findings, we further find that there is no evidence that the Contracting Officer—or any other Potential Authority Having Jurisdiction—approved a variation under the Contract Variation Procedure, or a modification under the Code Modification Procedure for the Initially-Installed Assembly on the Camp Hero East Project.

III. Purported Prior Course of Dealing

38. The Joint Venture submits affidavits asserting that it used foam with no thermal barrier on other arch-span projects that included the Baker drawings and required compliance with the Code and the Austere Standards (Hayward aff. ¶ 10; McFerrin aff. ¶¶ 31-36; Musa aff. ¶ 12).

39. The assertion regarding the Baker drawings is not credible because, at least some of the other projects referenced in the affidavits did not use the Baker drawings (R4, tab 375 at 2), and others used earlier versions of the Baker drawings (ASUMF ¶ 62).

40. The assertion regarding the use of foam without a thermal barrier also is not credible because there is evidence that the Joint Venture often used thermal barriers on other arch-span projects (app. supp. R4, tabs 137, 233, 235). Indeed, while the Joint Venture's Senior Program Manager, Dan McFerrin, complains about adherence problems, he admits that another project used a cementitious finish thermal barrier in particular (McFerrin aff. ¶ 34). Moreover, we do not find the declarant's assertion that the Joint Venture used foam with no thermal barrier credible in light of the inconsistency with the declarant's testimony in *ECC Int'l, LLC*, ASBCA No. 58993 *et al.*, 22-1 BCA ¶ 38,073 at 184,877, that the Joint Venture's arch-span designs had "polyurethane with a coat sealer over it" (app. supp. R4, tab 399 ¶ 44).

41. Further, the Joint Venture has not shown that the Corps accepted arch-span buildings without thermal barriers on prior projects as a matter of course. To the contrary, the Joint Venture acknowledges that the Corps rejected its foam assembly on at least two other occasions (McEerrin aff. ¶¶ 37-38).

42. The Joint Venture fails to submit any contemporaneous evidence from those other projects—such as the other contracts (*see* Hayward aff.; McErrin aff.; Musa aff.).

IV. Procedural History

43. On April 19, 2019, the Joint Venture submitted a certified claim regarding the foam assembly (R4, tab 3 at 1). The April 19, 2019 certified claim did not allege that a Potential Authority Having Jurisdiction approved a modification for the Initially-Installed Assembly under the Code Modification Procedure (*id.*). However, the April 19, 2019 claim cited an August 3, 2013 letter from the Joint Venture to the Contracting Officer (*id.* at 5). That April 19, 2019 letter alleged that:

> The Government, acting as the Authority Having
> Jurisdiction, agreed and approved those very same

assemblies on virtually all Arch-Span buildings in Afghanistan . . . . [I]t is evident that the Government has exercised its discretionary authority, as the Authority Having Jurisdiction, in determining the system's compliance across virtually every Arch-Span project in Afghanistan.

(R4, tab 94 at 5-6)

44. There was a deemed denial, as the Contracting Officer failed to issue a final decision (ASUMF ¶¶ 206-07; GRASUMF ¶¶ 206-07).

45. This appeal followed.

## DECISION

The Corps did not constructively change the Contract when it suspended work on the Initially-Installed Assembly, and then directed the Joint Venture to use 50 mils of the Paint.[12] In order to establish that there was a constructive change, a contractor must show that: (1) an official directed it to perform work not required under the terms of the contract; (2) the official directing the change had contractual authority to alter the contractor's duties unilaterally; (3) the official enlarged the contractor's performance requirements; and (4) the added work was not volunteered, but resulted from official direction. *CDM Constructors, Inc.*, ASBCA No. 60454 *et al.*, 18-1 BCA ¶ 37,190 at 181,011-12. In determining what work a contract requires, "clear and unambiguous [contract provisions] must be given their plain and ordinary meaning, and we may not resort to extrinsic evidence to interpret them." *Id.* at 181,012. (quoting *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc)). An ambiguity exists when a contract is susceptible to more than one reasonable interpretation. *Id.* (quoting *E.L.Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1341 (Fed. Cir. 2004)).

Here, the Transatlantic District-South did not direct the Joint Venture to perform work not required under the terms of the Contract, or enlarge the Joint Venture's performance requirements, when the Transatlantic District-South suspended work on the Initially-Installed Assembly, and subsequently directed the Joint Venture

---

[12] The Corps also gave the Joint Venture the option of using a cementitious finish— albeit a thicker one than required by the Contract to account for the fact that it would cover non-rated foam instead of the rated foam required by the Contract (finding 30). Because the Joint Venture ultimately installed the 50 mils of the Paint (finding 31), we focus on that direction.

to use 50 mil of the Paint.  The Contract permitted the Corps to suspend work if it did not comply with the Contract requirements (finding 12).  The Contract unambiguously required that the foam be covered with a cementitious finish, and comply with the Code, which required foam to be rated and covered with an adequate thermal barrier (findings 4, 8).  The Initially-Installed Assembly did not comply with those contract requirements because it included non-rated foam and did not include a cementitious finish (finding 18).  Therefore, the Transatlantic District-South did not direct the Joint Venture to perform work not required under the terms of the Contract, or enlarge the Joint Venture's performance requirements, when it suspended work on the Initially- Installed Assembly, and subsequently directed the Joint Venture to increase the thermal barrier thickness.

In response, the Joint Venture argues that:  (1) the foam assembly did not need to comply with the Code Foam Assembly Provisions because the Contract incorporated the Austere Standards, which purportedly indicated that the Joint Venture did not need to comply with the Code (app. br. at 108, 114, 116-17); (2) the Contracting Officer approved a variation under the Contract Variation Procedure, and/or the Authority Having Jurisdiction approved a modification under the Code Modification Procedure (*id.* at 108-09, 114-15); (3) the extrinsic evidence of the prior course of dealing and the Corps' contemporaneous understanding establish that the Initially-Installed Assembly met or exceeded the Contract's requirements (*id.* at 108, 111, 115, 118-20); and (4) rebuttal documents establish that the Initially-Installed Assembly complied with the Contract's requirements (Hayward rebuttal aff., exs. 1-2).  As discussed in greater detail below, none of those arguments have merit.[13]

I. The Austere Standards

The Contract required the Joint Venture to comply with the Code Foam Assembly Provisions, despite its requirement that the Joint Venture also comply with the Austere Standards.  We read a contract as a whole so as to give meaning to all of

---

[13] Even if the Contract's requirement that the Joint Venture comply with the Austere Standards meant that it did not have to comply with the Code Foam Assembly Provisions, or the Authority Having Jurisdiction had modified the Code Foam Assembly Provisions (neither of which is the case), that would not excuse the Joint Venture's failure to comply with the Baker Drawings' cementitious finish requirement, which alone would justify the Transatlantic District-South's stop-work order.  Conversely, even if the parties' prior course of dealing established that the Contract did not require a thermal barrier (which is not the case), that would not excuse the Joint Venture's failure to comply with Code § 2603.3's requirement that the Joint Venture use rated foam, which alone would justify the Transatlantic District-South's stop-work order.

its provisions. *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1057-58 (Fed. Cir. 1983).  Here, the Contract required compliance with both the Code and the Austere Standards (findings 4, 6).  While the Austere Standards generally exempted contractors constructing projects for the Afghan National Security Forces from codes applicable to United States construction, it made an exception (Specified Codes Exception) where a contracting officer specified a code for construction in a contract by stating that "however, codes will be specified for design and construction with only specific exemptions as delineated elsewhere in these standards" (finding 6).  The Specified Codes Exception applied here because the Contract specified the Code for construction, and the Austere Standards did not delineate specific exemptions regarding the foam's flame-spread and smoke-development limitations, or thermal barriers (findings 4, 6).  Therefore, when read as a whole, the Contract's requirement to comply with both the Austere Standards and the Code required the Joint Venture to comply with the Code Foam Assembly Provisions.

The Joint Venture argues that the Specified Codes Exception did not apply because, while the Contract specified for construction the Code, it did not specify for construction the specific sections of the Code addressing the foam assembly—i.e., the Code Foam Assembly Provisions (app. sur-reply at 12).  However, the Specified Codes Exception applied when a contracting officer specifies for construction "codes;" not specific sections of codes (finding 6).  Thus, the Contract's specification of the Code was sufficient to require compliance with the Code Foam Assembly Provision under the Specified Codes Exception (finding 4).

The Joint Venture also argues that the Austere Standards delineated a specific exemption from the Specified Codes Exception for thermal barriers by purportedly stating that the foam will be left exposed (app. br. at 114, 116).  However, the Austere Standards stated that "[arch]-span walls will be left exposed with polyurethane insulation" (finding 6).  Thus, it indicated that the arch-span walls—and not the foam—will be left exposed (*id.*).  In any event, even if that language were ambiguous (which is not the case) the Joint Venture's initial installation of a thermal barrier—albeit over non-rated foam—would demonstrate its contemporaneous understanding that it had to provide a thermal barrier (finding 18).  Further, the Joint Venture's argument does nothing to justify its use of non-rated foam.

The Joint Venture next points to our decision in *ECC Int'l, LLC*, ASBCA No. 58993 *et al.*, 22-1 BCA ¶ 38,073 (app. br. at 6, 120-21 n.31).  That case does not address the relevant issue here of whether a contract that mandates compliance with both the Austere Standards and the Code, and contains drawings showing a cementitious finish, requires rated foam and a cementitious finish.  22-1 BCA ¶ 38,073 at 184,879.

To the extent that the Joint Venture relies upon the Austere Standard's provisions stating that ceilings and interior walls do not need to meet fire boundary code requirements (app. br. at 114), those provisions do not establish that the Austere Standards delineated a specific exemption from the Specific Codes Exception for the foam's fire-spread and smoke-development limitations, or thermal barriers.  It is clear when read in context that the sentence stating that "[c]eilings do not need to meet fire boundary code requirements" was referring to drop ceilings because the paragraph was addressing drop ceilings (finding 6).  Moreover, the sentence stating that "[i]nterior walls do not need to meet fire boundary code requirements" expressly referred to interior walls (*id.*).  Those paragraphs were not referring to the interior of the arch-span structure because, as the Joint Venture concedes, the arch-span structure did not have drop ceilings or interior walls (app. br. at 2); *ECCI*, 22-1 BCA ¶ 38,073 at 184,877.  In any event, those provisions exempted drop ceilings and interior walls from the fire boundary code; not foam from the Code Foam Assembly Provisions (finding 6).

Moreover, even if the Joint Venture were correct that the Austere Standards exempted the Joint Venture from complying with the Code Foam Assembly Provisions (which is not the case), that merely would establish an inconsistency between the Contract requiring compliance with the Austere Standards and the Code.  Under those circumstances, the Contract expressly provided that the Contracting Officer should resolve the discrepancy (finding 7).  Here, the Contracting Officer resolved any ambiguity by rejecting the Initially-Installed Assembly that did not comply with the Code (finding 23).  Thus, the Austere Standards do not establish that the Initially-Installed Assembly met the Contract's requirements.

II.  Variation and/or Modification

Nor was a variation or modification of the Code Foam Assembly Provisions for the Initially-Installed Assembly under the Contract Variation Procedure, or the Code Modification Procedure, such that the Initially-Installed Assembly met the Contract's requirements.

A.  The Contracting Officer Did Not Approve a Variation Under the Contract Variation Procedure

First, the Contracting Officer did not approve a variation from the Code Foam Assembly Provisions for the Initially-Installed Assembly under the Contract Variation Procedure.  The government's approval of a submission that does not comply with a contract's requirements does not relieve a contractor of its obligation to comply with a contract, unless a contract has a procedure for obtaining a variation, the contractor complied with that procedure by pointing out a deviation from the contract's

requirements, and the agency approves a variation.  *Elter S.A.*, ASBCA No. 52327, 01-1 BCA ¶ 31,421 at 155,162; *see also BYA Int'l, LLC*, ASBCA Nos. 58031, 58341, 13 BCA ¶ 35,424 at 173,778.

Here, the Contract provided that approval of a submission by the Transatlantic District-South did not relieve the Joint Venture of its obligation to comply with the Contract's requirements (finding 9).  However, the Contract permitted the Joint Venture to request a variation through the Contract Variation Procedure by annotating ENG Form 4025 block h, stating in the remarks section that the transmittal was not in accordance with the Contract's plans and specifications, and justifying such a variation in writing at the time of submission (finding 10).  The Contracting Officer had to approve any variation (finding 11).

The Joint Venture points to the First Transmittal, the Re-Submitted First Transmittal, and the Second Transmittal (collectively, Transmittals) as evidence that it purportedly requested a variation; and the First Transmittal Response, the Re-Submitted First Transmittal Response, the Second Transmittal Response (collectively, Responses), and the April 21, 2012 engineer's email as evidence that the Transatlantic District-South purportedly granted a variation (app. br. at 108-09, 114-15).  However, the Transmittals did not request a variation to the cementitious finish and compliance with the Code Foam Assembly Provisions requirements for the Initially-Installed Assembly because they did not point out a deviation from the Contract's requirements by annotating block h, stating in the remarks section that the transmittals were not in accordance with the Contract's plans and specifications, and justifying any variation (finding 13, 15, 19).  Moreover, in the Transmittal Responses, the Contracting Officer did not approve a variation for the Initially-Installed Assembly because there is no evidence that the Contracting Officer wrote or authorized the Transmittal Responses, and the Transmittal Responses assigned receipt acknowledged codes—namely the F Code (receipt acknowledged) and the FX Code (receipt acknowledged, does not comply as noted with contract requirements)—instead of approval codes—namely the A Code (approved), the B Code (approved, except as noted on drawings), or the C Code (approved except as noted on drawings . . . resubmission required) (findings 14, 17, 20).

While an engineer opined that the Re-Submitted First Transmittal should receive a B Code (approved, except as noted on drawings) in an August 21, 2012 email, that does not constitute approval under the Contract Variation Procedure because it was not issued or approved by the Contracting Officer, or even sent to the Joint Venture—let alone on an ENG Form 4025 (finding 16).  On the contrary, the August 21, 2012 email expressed internally one engineer's opinion, which was opposed by at least one other employee, and ultimately rejected by the Transatlantic District-South (finding 16).  Rather, the Transatlantic District-South responded to the

21

Re-Submitted First Transmittal on the ENG Form 4025 with an F Code (receipt acknowledged) (finding 17).  Indeed, by submitting a Second Transmittal after the August 21, 2012 email, the Joint Venture recognized that the Transatlantic District-South had not approved a variation for the Initially-Installed Assembly (finding 19).

The Joint Venture asserts that Corps personnel who were not the Contracting Officer routinely approved Code variations, such as for the wall partitions (app. br. at 33-34; app. reply at 71).  However, unlike for the foam assembly, the Contract did not require that design features such as wall partitions comply with the Code because— unlike for the foam assembly—the Austere Standards contained specific exemptions from the Specific Codes Exception for the wall partitions (finding 6).  Thus, there was no variation requiring approval regarding those design features.  In any event, the Joint Venture's argument amounts to an argument that some Corps personnel had apparent authority, which we have found is an insufficient basis upon which to attribute an official's conduct to an agency.  *Meltech Corp., Inc.*, ASBCA Nos. 61706, 61768, 22-1 BCA ¶ 38,117 at 185,156 (citing *Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1344 (Fed. Cir. 2007)).

The Joint Venture also argues that transmittals for foam required Transatlantic District-South approval (app. reply at 35-36).   That is accurate, but it was the Joint Venture's responsibility under the Contract to ensure that all transmittals were correct (finding 9).  Therefore, the errors in the Transmittals—including their failure to request the Transatlantic District-South's approval—were the fault of the Joint Venture, and not the Transatlantic District-South.

The Joint Venture finally points to *Envtl. Chem. Corp.*, ASBCA Nos. 59280, 60760, 22-1 BCA ¶ 38,166 at 185,361-62; (app. br. at 113-14).  That case does not establish that the Contracting Officer approved a variation under the Code Variation Procedure here because, unlike in this case, the government official with authority approved the transmittal in that case.  *Envtl. Chem. Corp.*, 22-1 BCA ¶ 38,166 at 185,361-62.

In sum, the Joint Venture did not request, and the Contracting Officer did not approve, a variation from the cementitious finish and compliance with the Code Foam Assembly Provisions requirements for the Initially-Installed Assembly under the Contract Variation Procedure.

B.  Modification Under the Code Modification Procedure

While the Joint Venture's modification under the Code Modification Procedure argument is not a new claim, that argument lacks merit.

## 1.  The Modification Argument is not a new Argument

The Corps argues that we should not consider the Joint Venture's modification argument because that argument purportedly constitutes a new claim (gov't reply 260-62).[14]  We will not entertain a claim if it is a new claim that an appellant failed to present to the contracting officer.  *DLT Solutions, LLC*, ASBCA No. 63069, 22-1 BCA ¶ 38,144 at 185,270.  While an appellant may introduce on appeal additional facts that do not alter the nature of the original claim, its appeal must be based upon a common or related set of operative facts to those presented to the contracting officer.  *Id.*  A claim is new when it presents a materially different factual or legal theory of relief.  *Id.*  In determining the material facts presented to the contracting officer, we consider all of the correspondence submitted by an appellant.  *Holmes & Narver, Inc.*, ASBCA No. 51430, 99-1 BCA ¶ 30,131 at 149,054; *Valco Constr. Co., Inc.*, ASBCA Nos. 47909 48313, 96-2 BCA ¶ 28,344 at 141,552.

Here, while the April 19, 2019 claim did not specifically refer to the Joint Venture's modification argument, the August 2, 2013 letter from the Joint Venture to the Contracting Officer—which the April 19, 2019 claim cited and we must consider as part of the claim, *Holmes & Narver*, 99-1 BCA ¶ 30,131 at 149,054; *Valco Constr.*, 96-2 BCA ¶ 28,344 at 141,552—alleged that the Authority Having Jurisdiction modified the Code under the Code Modification Procedure (finding 43).  That allegation is not materially different than the modification argument the Joint Venture raises in this appeal.  Therefore, that argument is not a new claim.

## 2.  The Modification Argument Lacks Merit

However, a Potential Authorities Having Jurisdiction—let alone the Authority Having Jurisdiction (namely, the Contracting Officer (finding 5))—did not modify the Code Foam Assembly Provisions for the Initially-Installed Foam on the Camp Hero East Project.  The Code Modification Procedure allowed the Authority Having Jurisdiction to:

> grant modifications for individual cases, upon application
> of the owner or owner's representative, provided the
> [Authority Having Jurisdiction] shall first find that special
> individual reasons make the strict letter of this code
> impractical and the modification is in compliance with the
> intent and purpose of this code and that such modification

---

[14] We grant the Corps' motion to file a sur-reply regarding jurisdiction, and deny its motion to strike a portion of the Joint Venture's sur-reply.

does not lessen health, accessibility, life and fire safety, or structural requirements.

(Finding ¶ 5)

Here, the Joint Venture cites the Transmittals, the Transmittal Responses, the April 21, 2012 engineer email, the May 17, 2013 Transatlantic District-South email, the Transatlantic District-North Documents, the Transatlantic Division Modification Documents, and the Transatlantic Afghanistan District Memoranda (collectively, Cited Documents) (app. br. at 108-10).[15] However, none of the Cited Documents show that a Potential Authority Having Jurisdiction—let alone the Contracting Officer—granted a modification for the individual case of the Initially-Installed Assembly on the Camp Hero East Project based upon a finding that special individual reasons made complying with the strict letter of the Code impractical; a modification complied with the intent and purpose of the Code; and a modification did not lessen health, accessibility, life, and fire safety, or structural requirements (findings 13-20, 25-26, 33, 35). To the contrary:

> (1) As discussed in greater detail above, the Transmittals did not request a modification, and neither the Transmittal Responses nor the April 21, 2012 engineer email approved any modification—let alone constituted any Potential Authority Having Jurisdiction making a finding that special individual reasons made complying with the strict letter of the Code Foam Assembly Provisions impractical; a modification complied with the intent and purpose of the Code; and a modification did not lessen health, accessibility, life and fire safety, or structural requirements (findings 13-20).

> (2) The May 17, 2013 Transatlantic District-South email merely recognized that the Authority Having Jurisdiction had the power to modify the Code; not that he actually had

---

[15] The Joint Venture also cites opinions from fire experts that there was a modification under Code Modification Procedure (app. br. at 108-09). However, we do not give that testimony weight because an expert may not give testimony regarding ultimate legal conclusions, *Lockheed Corp.*, ASBCA No. 36420 *et al.*, 91-2 BCA ¶ 23,903, and it is unsupported by contemporaneous communications. *See Hurst Excavating, Inc.*, ASBCA No. 37351, 93-3 BCA ¶ 25,935 at 128,991 (expressing a preference for contemporaneous evidence over post-hoc opinions).

done so for the Initially-Installed Assembly on the Camp Hero East Project (finding 25).

(3)     The Transatlantic District-North Documents merely showed that the Transatlantic District-North disagreed with the Transatlantic District-South's opinion that the Initially-Installed Assembly did <u>not</u> qualify for a modification, and that the agencies referred the dispute to Mr. Dalton as the Authority Having Jurisdiction (findings 26-27). Mr. Dalton agreed with the Transatlantic District-South that the Initially-Installed Assembly did <u>not</u> qualify for a modification because there was inadequate testing of the assembly (finding 28).

(4)     The Transatlantic Division Modification Documents merely recognized that the Authority Having Jurisdiction later granted a modification on the Camp Hero East Project for the Non-Rated Foam with 50 mil of the Paint; not that he had granted a modification for the Initially-Installed Assembly with 18 mil of the Paint (finding 33).

(5)     The Transatlantic Afghanistan District Memoranda merely showed that the Transatlantic Afghanistan District asked CJ-Engineer Graham, as the Authority Having Jurisdiction, for permission to use the opaqueness of the Paint as a proxy for thickness on other projects besides the Camp Hero East Project due to the operational needs of those projects (finding 35). However, there is no evidence that CJ-Engineer Graham responded to the Transatlantic Afghanistan District Memoranda, let alone that any response modified the Foam Assembly Provisions for the individual case of the Initially-Installed Assembly on the Camp Hero East Project (finding 36). On the contrary, the Initially-Installed Assembly work already had been suspended on the Camp Hero East Project—and the Transatlantic District-South already had directed the Joint Venture to correct the deficient foam assembly—before the Transatlantic Afghanistan District Memoranda (findings 23, 30, 35).

The Joint Venture argues that the Corps retroactively approved the Initially-Installed Assembly by ultimately approving a foam assembly that did not comply with

25

the Contract's requirements (app. br. at 40). The Joint Venture is correct that the Corps ultimately did not insist upon strict compliance with the Contract (i.e., by requiring rated foam and a cementitious finish)—and instead accepted the Non-Rated Foam with 50 mil of the Paint (finding 30). However, that was because the Contracting Officer modified the Code Foam Assembly Provisions requirements for the individual case of the Non-Rated Foam with 50 mil of the Paint based upon testing showing that that the Non-Rated Foam with 50 mil of the Paint complied with the intent and purpose of the Code, and that such a modification did not lessen health, accessibility, life and fire safety, or structural requirements (findings 29-30). That later approval of the Non-Rated Foam with 50 mil of the Paint did not retroactively approve the Initially-Installed Assembly of Non-Rated Foam with 18 mil of the Paint because the Initially-Installed Assembly had less Paint as a thermal barrier, and thus the later testing did not show that the Initially-Installed Assembly's Non-Rated Foam with 18 mil of the Paint complied with the intent and purpose of the Code, and that such a modification did not lessen health, accessibility, life and fire safety, or structural requirements (findings 18, 29-30).

Indeed, because we must decide whether the Transatlantic District-South required the Joint Venture to perform work not required under the Contract and enlarged the Joint Venture's performance requirements when it suspended work on the Initially-Installed Assembly, the relevant issue here is whether the Authority Having Jurisdiction had rendered the Initially-Installed Assembly Contract-compliant by modifying the Contract's requirements prior to the suspension of work. All of the Cited Documents—except Transmittals, Transmittal Responses, and the April 21, 2012 engineer email, which are discussed above—post-date the April 7, 2013 suspension (findings 23, 25-26, 33, 35). Thus, none of those Cited Documents are relevant.

In sum, a Potential Authority Having Jurisdiction did not approve a modification for the Initially-Installed Assembly on the Camp Hero East Project under the Code Modification Procedure.

III. Extrinsic Evidence

We may not resort to extrinsic evidence of the parties' contemporaneous interpretation of the Contract or prior course of dealing, which, in any event, does not establish that the Initially-Installed Assembly met or exceeded the Contract's requirements.

26

I.   We may not Resort to Extrinsic Evidence

We may not resort to the extrinsic evidence of the parties' contemporaneous interpretation of the Contract or prior course of dealing because the Contract is not ambiguous. We only resort to extrinsic evidence of the parties' contemporaneous interpretation or prior course of dealing to interpret a contract if the contract is ambiguous. *United States v. Graham*, 110 U.S. 219, 221 (1884); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1355 (Fed. Cir. 2004); *Coast Fed. Bank*, 323 F.3d at 1040; *Raytheon Co.*, ASBCA Nos. 60488, 60785, 20-1 BCA ¶ 37,637 at 182,733; *TECOM, Inc.*, ASBCA No. 44122 *et al.*, 94-1 BCA ¶ 26,483 at 131,821.[16] Here, as discussed above, the Contract is not ambiguous. Therefore, we may not resort to extrinsic evidence of contemporaneous interpretation or prior course of dealing to interpret the Contract.

II.   Purported Contemporaneous Interpretation Evidence Does not Establish That the Initially-Installed Assembly Met or Exceeded the Contract's Requirements

In any event, the purported contemporaneous interpretation evidence does not establish that the Initially-Installed Assembly met or exceeded the Contract's requirements. "Only an authorized government representative may bind the government to an interpretation of a contract." *Gen. Dynamics-Nat'l Steel & Shipbuilding Co.*, ASBCA No. 61524, 22-1 BCA ¶ 38,067 at 184,826; *see also Unitec, Inc.*, ASBCA No. 22025, 79-2 BCA ¶ 13,923 at 68,350 (holding that there must be a meaningful connection to impute a government employee's knowledge to the authorized representative).

Here, the Joint Venture again points to the Cited Documents in an attempt to establish the Transatlantic District-South's contemporaneous understanding (app. br. at 119).[17] However, none of the Cited Documents bind the Transatlantic District-

---

[16] A contractor also may use prior course of dealing evidence to establish waiver of an unambiguous contract provision. *Raytheon Co.*, 20-1 BCA ¶ 37,637 at 182,733. Here, the Joint Venture does not argue that the Transatlantic District-South waived an unambiguous contract provision (app. br. at 118-21). Even if it had, as discussed above, the Joint Venture has failed to show that the prior course of dealing involved the same contracting agency and essentially the same contract provision.

[17] The Joint Venture also cites the Transatlantic District-South's suspension and subsequent lifting of that suspension (app. br. at 119). Without explanation from the Joint Venture—of which there is none—we fail to see how the suspension of the Initially-Installed Assembly work and lifting of that

South to an interpretation of the Contract because they were not from an authorized Transatlantic District-South representative (findings 13-20, 25-26, 33, 35)—namely the Contracting Officer (finding 2).  Moreover, the Joint Venture does not even attempt to show that the interpretations of the Cited Documents' authors can be imputed to the Contracting Officer (app. br. at 119).  In any event, as discussed above, none of the Cited Documents show that the author interpreted the Contract to permit the Initially-Installed Assembly on the Camp Hero East Project (findings 13-20, 25-26, 33, 35).  On the contrary, the Cited Documents and other contemporaneous records show that the Transatlantic District-South interpreted the Contract to not permit the Initially-Installed Assembly on the Camp Hero East Project, and that Mr. Dalton—acting as the Authority Having Jurisdiction—agreed with the Transatlantic District-South's interpretation (findings 25, 28).  Therefore, the contemporaneous interpretation evidence does not establish that the Contract permitted the Initially-Installed Assembly.

### III.  Purported Prior Course of Dealing Evidence Does not Establish That the Initially-Installed Assembly met or Exceeded the Contract's Requirements

Nor does the purported prior course of dealing evidence—namely the affidavits asserting that the Joint Venture used exposed foam without a thermal barrier on other arch-span projects that included the Baker drawings and required compliance with the Austere Standards and the Code—establish that the Contract did not require a thermal barrier (app. br. at 120; findings 38-41).  In order to establish a prior course of dealing, a contractor must show that the prior dealings involved the same contracting agency, the same contractor, and essentially the same contract provision. *Raytheon Co.*, 20-1 BCA ¶ 37,637 at 182,734.  Here, the Joint Venture has failed to show that the prior dealings involved the same contracting agency (namely, the Transatlantic District-South), that the prior dealings involved essentially the same contract provision, or that the prior course of dealing was for the Transatlantic District-South to accept the foam without a thermal barrier (findings 39-42).  On the contrary, there is evidence that on several other projects to which the Joint Venture appears to be referring, the Corps did not use the same version of the Baker drawings, the Joint Venture installed a foam assembly with a thermal barrier, or the Corps rejected the foam assembly (findings 39-42).  In any event, the vague affidavits upon which the Joint Venture relies are insufficient to establish a prior course of dealing because the Joint Venture fails to submit evidence from those other projects—such as the other contracts—that would allow us to determine whether those other projects in fact were similar to the Camp

---

suspension with a direction to install the Non-Rated Foam with 50 mil of the Paint shows that the Transatlantic District-South interpreted the Contract to allow the Initially-Installed Assembly.  On the contrary, those documents prove the opposite.

Hero East Project. *ACE Precision Indus.,* ASBCA No. 40307, 93-2 BCA ¶ 25,629 at 127,553; (finding 42). Thus, the Joint Venture cannot establish a prior course of not requiring a thermal barrier.

IV. <u>Rebuttal Documents</u>

Finally, the Joint Venture moves to admit a new affidavit it submits with its reply brief. While Board Rule 11 generally permits us to consider affidavits that are not in the Rule 4 file, the only purpose of the new affidavit in this case is to introduce documents that are not in the Rule 4 file (Rebuttal Documents) into evidence (app. reply to mot. to enter Hayward's Affidavit into evidence at 7; Hayward rebuttal aff.).[18] Our pre-hearing orders required that all documentary evidence be submitted as part of the Rule 4 file (Bd. corr. ltr. dtd. April 1, 2020), and the amended deadline for supplementing the Rule 4 file was September 30, 2022 (Bd. corr. ltr. dtd. July 2, 2021; Bd. corr. ltr. dtd. March 10, 2022; Bd. corr. ltr. dtd. July 20, 2022). Yet, the Joint Venture did not supplement the Rule 4 file with the Rebuttal Documents by September 30, 2022. To admit those documents now—when the Corps will not have a chance to respond—would unduly prejudice the Corps. *Cf. CBRE Heery, Inc.*, ASBCA No. 62420, 21-1 BCA ¶ 37,927 at 184,199 (citing *Hannon v. Dep't of Justice*, 234 F.3d 674, 680 (Fed. Cir. 2000) (holding that a party waives arguments that could have been—but were not—raised in an opening brief); *Dan's Janitorial Services, Inc.*, ASBCA No. 27837, 85-1 BCA ¶ 17,924 at 89,748-49).

In any event, the Rebuttal Documents—particularly the October 17, 2012 Preparatory Phase Checklist and the May 20, 2013 email[19]—do not help the Joint Venture. The October 17, 2012 Preparatory Phase Checklist does not establish that the Contracting Officer approved a variation for the Initially-Installed Assembly under the Contract Variation Procedure because the Contracting Officer did not issue the

---

[18] In addition to seeking to admit the Rebuttal Documents through the new affidavit, the Joint Venture moves to "repair" the Rule 4 file, which we read as a motion to correct the Rule 4 file. Several documents in the Rule 4 file merely contain place holders with a bates number and a statement that the document was produced in a native format. The Joint Venture seeks to substitute those place holders with PDFs. That motion is granted because—unlike with the motion to admit a new affidavit—the Joint Venture merely seeks to correct the Rule 4 file instead of adding new documents. Because the Joint Venture originally produced an index and provided bates numbers—which allowed the Corps to identify the documents—we see no prejudice to the Corps.

[19] The remaining Rebuttal Documents address quantum or a tangential dispute regarding Mr. Garabedian's contemporaneous statements, neither of which are relevant to our denial of this appeal on the merits.

Preparatory Phase Checklist, he did not issue the Preparatory Phase Checklist in response to a transmittal—let alone on an ENG form—from the Joint Venture justifying a variation, and the Preparatory Phase Checklist did not approve a variation from the Code Foam Assembly Provisions (Hayward rebuttal aff., ex. 1).  Nor does the October 17, 2012 Preparatory Phase Checklist establish that the Authority Having Jurisdiction modified the Code Foam Assembly Provisions under the Code Modification Procedure because none of the Potential Authorities Having Jurisdiction issued the October 17, 2012 Preparatory Phase Checklist, or issue the Preparatory Phase Checklist based upon a finding that special individual reasons made complying with the strict letter of the Code impractical; a modification complied with the intent and purpose of the Code; and a modification did not lessen health, accessibility, life and fire safety, or structural requirements (*id.*).  On the contrary, the October 17, 2022 Preparatory Phase Checklist addressed worker safety in installing the foam assembly, and not its flame-spread and smoke-development limitations once installed (*id.*).

Nor can we resort to the May 20, 2013 email as extrinsic evidence of the Transatlantic District-South's contemporaneous understanding of the Contract because—as discussed above—the Austere Standards unambiguously indicated that the arch-span walls—and not the foam—would be left exposed (finding 6).  Moreover, the May 20, 2013 email was not written by—and cannot be imputed to—the Contracting Officer (Hayward rebuttal aff., ex. 2).  In any event, while the May 20, 2013 email stated that the Austere Standards called for "unfinished exposed foam insulation," it ultimately interpreted the Contract to require rated foam with a thermal barrier (*id.*).[20]  Thus, the Rebuttal Documents do not help the Joint Venture, even if we were to admit them into evidence (which we decline to do).

---

[20] We are not saying that we agree with the May 20, 2013 email's interpretation.  We merely are pointing out that, if the Joint Venture wishes to use the May 20, 2013 email as evidence of the Transatlantic District-South's contemporaneous interpretation, then it cannot ignore its ultimate conclusion that the Contract required rated foam with a thermal barrier.

DOCUMENT FOR PUBLIC RELEASE.  The decision issued on the date below is subject to an ASBCA Protective Order. This version has been approved for public release.

CONCLUSION

For the foregoing reasons, we deny the appeal.

Dated:  September 20, 2023

JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

31

DOCUMENT FOR PUBLIC RELEASE.  The decision issued on the date below is subject to an ASBCA Protective Order. This version has been approved for public release.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62124, Appeal of ECC International Constructors/ Metag (JV), rendered in conformance with the Board's Charter.

Dated:  September 20, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals